[No. 15981.   Department One.   December 22, 1920.]

*In re Matter of Welfare of* FREDERICK A. MEAD.
F. A. MEAD, *Appellant,* v. LISH WOREL *et al.,*
*Respondents.*[1]

PARENT AND CHILD (3, 4)—CUSTODY OF CHILD—WELFARE OF CHILD
—COMPETENCY OF PARENT—PARENTAL RELATIONS AND DUTIES.   The
custody of a dependent child of tender years should be awarded to
a father, and a former order to the contrary modified, where the
father's situation had materially changed, he was a fit and proper
person to have the custody, and had a home where the child's two
sisters and stepmother would give it every care and advantage.

Cross-appeals from an order of the superior court
for Yakima county, Taylor, J., entered May 24, 1920,
upon findings against the petitioner, denying an appli-
cation to modify a former judgment awarding the cus-
tody of a minor child to defendants, and denying to
defendants an application for the adoption of the child,
after a hearing before the court.   Reversed.

*Reynolds, Ballinger & Hutson,* for appellant.

*Chadwick, McMicken, Ramsey & Rupp* and *William-
son & Luhman,* for respondents.

MACKINTOSH, J.—F. A. Mead appeals from an order
entered by the superior court of Yakima county upon
an order to show cause why a former judgment of that
court should not be modified.   Lish Worel and his wife
cross-appeal from the court's denial of their applica-
tion for the adoption of Frederick A. Mead.

October 24, 1918, Lish Worel filed a petition in the
superior court of Yakima county, claiming that Fred-
erick A. Mead, a child then two years of age, was a
dependent child and was in his custody; that his
mother was dead; that he had no legal guardian; that

[1]Reported in 194 Pac. 807.

his father had not properly provided for him, and asked that the child be made a ward of the juvenile court. F. A. Mead, the father of the child, filed an answer to this petition, denying the allegations and alleging that Lulu Worel, the wife of the petitioner, undertook to temporarily care for the child until such time as the father would be able to provide for him in a proper manner, and that, by virtue of that arrangement, the child had been in the care of the petitioner and his wife since that time. The child's mother died on the 12th day of November, 1916, when the child was about two months of age.

Upon this petition and answer a hearing was had and the court, by its judgment filed January 10, 1919, found that Frederick A. Mead was a dependent child, and

"further ordered and adjudged that said child be declared to be a ward of this court; that he be placed in the custody of the petitioner, Lish Worel and wife, subject to the further order of the court."

August 6, 1919, F. A. Mead filed an application to so modify the order as to award him the custody of the child, and upon this petition an order to show cause was issued, to which the Worels filed an answer, denying the allegations of the petition. Accompanying the answer of the Worels was an application for permission to adopt the child. The matter came on for hearing on February 20, 1920, and on May 24, 1920, an order was entered awarding the custody of the child to the Worels for a period of ten years. It is from this order the father has appealed.

The application of the father, dated August 6, 1919, set forth that, subsequently to the entry of the judgment of January 10, 1919, his condition had so changed that he was then in a position to furnish the child a

better home and surroundings than he could have at the time of the original judgment. The testimony in support of this allegation we will refer to in passing upon the merits of the case.

It is alleged as error that the trial court erred in giving any force and effect to the judgment filed January 10, 1919, for the reason that it appears from the findings of fact made by the court, upon which that judgment was based, that the child was not a dependent child. It is also claimed that the court erred in holding that the judgment filed January 10, 1919, was *res adjudicata* as to all matters occurring up to that time, and refusing to admit evidence of facts occurring prior to that date.

A considerable portion of the arguments of both parties has been devoted to a discussion of these two questions, but the determination that we have arrived at makes unnecessary their discussion in this opinion, for the testimony in the case as to the change in the father's situation subsequent to January 10, 1919, convinces us that he should be awarded the custody of his son.

Assuming that it is improper to consider the situation prior to January 10, 1919, and taking as correct the juvenile court's determination that this child was a dependent (however contrary that may have been to the true situation), we will see how the situation presented itself at the time of the hearing upon the petition for a modification of that judgment, and since the prior judgment.

We find that since January, 1919, the father has married and has a home at Portland, Oregon, pleasantly situated and comfortably furnished, with ample grounds surrounding the house for the child's exercise and amusement; that the step-mother is, in every re-

spect, a fit and proper person to assist in the care, education and development of the child; in the home are this child's two sisters, who, unquestionably, are fond of the child and desirous of having him with them; and that the father has, since January, 1919, secured a position which affords him sufficient means to maintain a home in the proper manner, which occupation is such that he can and does spend his evenings at home; that there are, in the neighborhood, children of about this child's age, and suitable and fit companions for him; and that the whole situation is such that there is no question about the physical, mental and moral environment being entirely satisfactory; and that the child will have the constant care, protection and supervision of the father and his wife; whereas, in January, 1919, the court found that the father had no home which was suitable, and was engaged in an occupation which kept him away from home the greater part of the time, and that the father had no person who could care for the child during his absence.

There was also evidence to show that the Worels, up to the time the father filed his petition for modification of the judgment, were living in an apartment house, where the surroundings were not at all comparable with those which obtain in a home such as the father now has; that Lish Worel is engaged in the contracting business, which calls for his presence in different localities; that as he is awarded contracts in these places he moves near the place of his work, or, if he does not do so, he is absent a great deal of the time from his home, and that the determining factor in both the judgments entered by the court was the fact that, during the period in which the Worels had had the care and custody of the child, there had come, as the court said, "to exist a very strong attachment

between the child and the said Worels," and "that there has grown up between said Lish Worel and Lulu Worel and the child a reciprocal affection, practically as deep and strong as could exist were the child their own."

Assuming, for the moment, that the home of the father is no more suitable and fit a place than the Worel home for the upbringing of this child, it is for us to determine whether the child, still of very tender years, should be deprived of the guidance and companionship of his own, father, and left to remain with the Worels, principally because they have grown very much attached to him, and he reciprocates that feeling.

It would seem that a parent should not be deprived of the opportunity of fulfilling the duties which he owes to his own flesh and blood, and which he is willing to perform, unless his circumstances are such that the welfare of the child would be jeopardized. The child, too, is entitled to the mutual relations with his parents, and in this case the added association with his sisters. These relations will not be disturbed for merely adventitious external circumstances. We note a growing disposition of the court to more and more permit adventitious temporal advantages to interfere with the natural relations of parents and children, too much emphasizing the assertion that the welfare of the child is the paramount consideration, gauging that welfare by the physical comfort of the child, forgetting the influence of parental association. In spite of all the supervision which modern legislation has imposed upon domestic relations, the time has not yet come when the courts are called on to place themselves in *loco parentis*. Some heed must still be paid to the rights and obligations of parents and the place of father, mother, sisters and brothers, is not to be taken

by the state. We must not lose sight of the fact, too, that the duties which a child owes its parents are duties which peculiarly form its character and make strong men and women, for, as the parent and child journey through life together, the time comes when the father must be borne upon the shoulders of the erstwhile child, as "the young Aeneas did the aged Anchises bear" from the flames of Troy.

A poor home with a father's and mother's love and protection, is still a more fit place for the child than the abode of more prosperous strangers. Upon whomever the custody of the child may be placed by law, it is only a legal obligation, as compared with the fundamental moral obligations of natural parenthood.

Although our later cases may have stressed the so-called welfare of the child (and we do not object to this, provided it be inclusive enough, and not be measured too much by the physical advantages or lack of them), with a danger of losing sight of the essential fundamentals of child life. These later cases should be read in the light of what Judge Dunbar, in *Lovell v. House of the Good Shepherd,* 9 Wash. 419, 37 Pac. 660, 43 Am. St. 839, said:

"While it is true that the welfare of the child should be the first consideration of the court, yet the right of the parent is not to be disregarded, and it is assuming a grave responsibility to deprive parents of the care, control, custody and education of their children because they do not come up to the standard of perfection that we have established for our own action in that respect. There is, perhaps, scarcely a day but that children may be seen who, in the ordinary estimation, are neglected, and of whom the popular verdict would declare, that they would be better off and stand a better chance of becoming useful members of society if they were removed from the pernicious influence of their parents. Yet it would not do for that reason to

interfere with the domestic relations, or to set up our particular standard for the guidance of families in general. There is such a diversity of religious and social opinion and of social standing and of intellectual development and of moral responsibility in society at large, that courts must exercise great charity and forbearance for the opinions, methods and practices of all different classes of society; and a case should be made out which is sufficiently extravagant and singular and wrong to meet the condemnation of all decent and law-abiding people without regard to religious belief or social standing before a parent should be deprived of the comfort and custody of a child."

On the showing made by the father, upon the hearing of his petition for a modification of the judgment, the court should have modified that judgment so as to give the custody of this boy to his father. This determination, of course, disposes of the cross-appeal of the Worels. The judgment is reversed.

HOLCOMB, C. J., PARKER, and BRIDGES, JJ., concur.