[No. 21683. Department One. March 25, 1929.]

RALPH E. PENNEY, *Appellant*, v. NELLY PENNEY, *Respondent*.[1]

Danson, Lowe & Danson, and Schwellenbach, Merrick & Macfarlane, for appellant.

Dykeman, Monheimer & Griffin, for respondent.

TOLMAN, J.—The record parties to this action were divorced by a decree entered by the superior court for

[1]Reported in 275 Pac. 710.

Yakima county on August 28, 1918. Among other things, that decree provides:

"That the custody of the minor child Virginia Penney be and is hereby awarded to the defendant Nelly Penney and the custody of the minor child Jimmie Penney be and is hereby awarded to the plaintiff Ralph E. Penney.

"That the plaintiff be and he is hereby required to pay to defendant for the support of said minor child Virginia Penney the sum of Forty Dollars a month, commencing September 1st, 1918, and the first of each and every month thereafter until such said minor shall attained her majority."

In June, 1928, this proceeding was begun in the superior court for King county (presumably because the defendant was then a resident of King county), seeking a modification of the former decree to the extent of awarding the custody of the minor child Virginia to the father, and the abrogation of the provision for the payment by the father to the mother of the sum of $40 per month for the support of Virginia.

The defendant, though served with process, made no written or personal appearance, and, at the trial, appeared only by her attorney, who seems to have so appeared in the interest of those to whom the mother had committed the child, since they, only, offered any defense.

The trial court denied any relief, and the plaintiff has appealed.

It fairly appears from the evidence that the little girl Virginia was about three years old when the decree was entered, and that, for approximately six months after the entry of the decree, she remained with her mother or with relatives of her mother. In February, 1919, the child Virginia was, by the mother, placed with a Mrs. Mohr and her daughter Jessie Mohr, who

were entire strangers to the blood and wholly unknown to the father.

In the meantime, the father had married again, and, shortly after the child had been placed with the Mohrs, desiring to see her, he, after some trouble and effort and through correspondence with the mother, learned that the child was being cared for by the Mohr family near Centralia, Washington. There he went from his home in Yakima to see the child, but according to his testimony, he did not receive a cordial welcome, was not permitted to see the child except in the presence of members of the Mohr family, and his suggestions that he be permitted to take the child home with him were not entertained, he being informed that the mother had instructed them not to give up the child. Again in January, 1920, the father sought to visit the child, and after considerable search and inquiry, found that the Mohr family had removed to Aberdeen, where he did visit the child with about the same results as before.

The father, not being satisfied with this situation and with the child being left in the custody of strangers, interviewed the trial judge who had entered the decree, and consulted an attorney in Yakima, seeking some method by which the child could be returned to him and become a member of his new family. His attempts in this direction were, at that time, discouraged by those he consulted, for reasons not now necessary to state.

Shortly following this, the father, partly for business reasons and partly because he desired an outdoor life for his health's sake, removed with his family, then consisting of his wife and a son born of the first marriage, to Alberta, where he settled upon an irrigated tract, invested all his financial means and undertook the venture of planting an orchard.

Up to the time the father removed to Canada, he had paid the $40 per month, provided for in the decree, to the mother or her attorney. At about the time he so removed, he received a message from the mother, through his own attorney, to the effect that she had married a wealthy man, would take Virginia into her new home and no longer needed the $40 per month. The father, acquiescing therein, made no further payments. It appears that the child was not so taken to the new home, but remained with the Mohrs at all times, and the mother, it seems, was afterwards divorced from her second husband and, in course of time, married a third husband, with whom she is now living in Seattle.

The father's farming venture in Canada proved a complete financial failure. He lost everything he had, and, after some three years, returned, practically penniless, to Washington, taking up his residence near Spokane, where for a time he engaged in farming, but being again unsuccessful, sought and maintained employment as a dentist upon a salary. The family was very close pressed financially for a considerable time, being in want of many of the actual necessities of life, and only when the father began to get upon his feet financially, did he again renew his attempts to obtain the custody of the child Virginia.

Shortly after becoming employed on a salary, he employed an attorney in Spokane for the purpose of obtaining the custody of the child, but that attorney's efforts seem to have been delayed and thwarted because, at that time, the whereabouts of the mother could not be ascertained. Finally, after some time, the mother's Seattle address was obtained. The father went to see her in Seattle at that address, only to learn that she had gone to Alaska. In the meantime, the Mohr family, with Virginia, had removed to Belling-

ham, and the father went there to see them and her with no satisfactory results. His attempts to see the child seem to have been rather vigorously discouraged, and at this time apparently the Mohrs made claim that there was due them $40 per month for the care of the child during the whole time that she had been with them, that nothing whatever had been paid to them, and there is some showing that they used this situation to strengthen their claim of right to retain the child and to hamper and delay the father's attempt to regain her custody.

Whether the Mohrs were as purely financially minded as the father thought, it is not necessary now to inquire, but apparently he had reason to feel that the Mohrs would only surrender the child to him upon payment of $40 per month for the entire term that she had been with them, and, of course, such a payment in a lump sum was entirely beyond his financial ability.

The father then employed an attorney in Seattle with instructions to obtain the custody of the child, but here again there was delay, but delay without the father's fault or connivance. The attorney appears to have thought that something might be arrived at by negotiating, and delayed bringing any action for a considerable time, though he finally did file a petition to modify the decree in the Yakima court.

Several visits were made to Bellingham by the father, accompanied by his wife and son. They were allowed to see Virginia in the presence of members of the Mohr family, but apparently were at all times made to feel that they were intruders.

During all of this time, the father was advised by his attorneys not to make further payments for the support of Virginia under the decree, and especially not to make such payments to the Mohrs, and at no time was ever any direct demand made by the mother

upon the father for any of such back payments. However, by some arrangements between the Mohrs and the mother, contempt proceedings were started in the Yakima court to enforce payment of the support money, but apparently no order was ever entered. A memorandum opinion from the Yakima court was introduced in evidence, indicating that the Yakima court was inclined to hold the father to be in contempt unless he resumed payments at the rate of $65 per month, $40 of which should cover current payments and the excess should be applied upon back payments.

Following this, the father immediately started this proceeding, and in the meantime paid two such $65 monthly installments, but to whom does not clearly appear.

It very clearly appears that the mother has entirely abandoned the child, has not even seen her for four or five years and apparently has lost all interest in her. It also rather clearly appears that the Mohr family consists of the mother, a woman past the prime of life, and her daughter, who is, and has been at all times since the child has been with them, gainfully employed in mercantile enterprises, now having a responsible position in a mercantile establishment in Bellingham, receiving an excellent salary and bonuses sufficient to enable her to financially care for the child, but she is away from home throughout business hours and considerable time in the evenings, and also makes semi-annual trips as a buyer to New York, being absent apparently several weeks each time.

The father's home life, home surroundings and ability to care for the child are quite fully gone into, and the trial court very properly held that the father was a fit and proper person to have the custody of the child at this time.

It may be stated, as having some weight upon the question, that, by leave of court and upon giving a bond for her return, the father was permitted to have Virginia visit him for a time just before the hearing, and her association with the members of his family during that visit is shown quite carefully. The visit was pleasant and agreeable, and the child responded to it as much as could be expected in view of her being almost a complete stranger. The child was not called to the witness stand, but by consent the trial judge privately interviewed her. What he learned by that interview is not disclosed by the record. Other facts will be mentioned as we proceed.

In simple terms, we have here a contest between a father and a stranger to the blood. The father's natural and legal rights were not destroyed by the decree. They were limited, only, in favor of the mother. The mother having abandoned the rights which the decree gave her and apparently her natural rights as well, the father stands in the same position as to strangers as he would if the decree had never been entered.

Under these conditions, the love and affection which have grown up between the child and those in whose care she has been for ten years, is not a controlling factor. Nor is the fact, if such should be the fact, that the strangers to the blood might be able to give her more pleasant and luxurious surroundings, better educational facilities and like advantages, a factor to be weighed against the father's rights, if he be a fit and proper person to have the custody of his own child.

Neither can we say that the father is in default or contempt under the original decree so as to be barred from seeking relief. The award was not for the benefit of the mother, but for the child alone.

In a large part, that which was paid before any default occurred, was not used for the child's benefit, but was apparently applied by the mother to her own uses. That fact alone would justify the father in suspending payments until, in some way, assured that the money he might pay would be applied as the decree provided.

No one says that the mother did not send the message upon which the father relied in ceasing to make payments, and under such a record, we doubt that any court would hold the father to be guilty of contempt.

■ But it is said that the father, by his long absence in Canada, his silence for a considerable time and his failure to make earlier and more effective efforts to regain the custody of the child, has forfeited his rights. Paternal or maternal rights will not be held to have been abandoned except upon a plain showing to that effect, and that the acts are without justifiable excuse. Here, we think the father's financial reverses and his prompt resumption of efforts as soon as financially able so to do, fully excuse the apparent delay.

■ It is suggested that the trial court may have learned from the child that she preferred to remain a member of the Mohr family, and that at her present age her wishes should be regarded. We doubt whether a child of thirteen years, who has for ten years been separated from her father and her older brother, and who has never known her step-mother and half-sister, is in any position to judge; and, we doubt if there is authority or reason for permitting any minor child of whatever age to set aside the natural and legal rights of her own father or mother in favor of a stranger to the blood, however kind and capable that stranger may be. In this respect, we may say that the record rather strongly suggests that the Mohr

family had, for a long time, sought to prevent the child from having any love for, or confidence in, her father, which in itself is a thing to be strongly condemned. In *Brock v. Brock,* 123 Wash. 450, 212 Pac. 550, it was said:

"In determining what is for the best welfare of a child of tender years, the courts must consider not only food, clothing, shelter, care, education and environment, but must also bear in mind that every such child is entitled to the love, nurture, advice and training of both father and mother, and to deny to the child an opportunity to know, associate with, love and be loved by either parent, may be a more serious ill than to refuse it in some part those things which money can buy."

See also *Delle v. Delle,* 112 Wash. 512, 192 Pac. 966, and *McClain v. McClain,* 115 Wash. 237, 197 Pac. 5.

The child is entitled to know and enjoy the father's love and care, to be brought up under the circumstances and conditions to which she was born and to have the love and society of brother and sister. The fostering care of a stranger, no matter how wise and kind, cannot fill the place of these. There is every reason to believe, even though the child's attitude might be hostile at first, that, in a few months or a year or two at most, she will fit as naturally into her father's home as if she had known no other; and she will then have the home memories to carry through life and hand down to her children. In other words, she will be a Penney, as she was born, with the memories and traditions of a Penney, and not a Mohr, whose traditions may be wholly foreign to those of the Penney family.

While we have no case exactly similar, yet these views are, we think, in entire harmony with and are supported by the views of this court previously expressed. *In re Smith,* 118 Wash. 1, 202 Pac. 243;

*In re Mead,* 113 Wash. 504, 194 Pac. 807; and *In re Stanley,* 143 Wash. 440, 255 Pac. 656.

We think the decree must be modified as prayed for, and, in abrogating the provision as to payments for the support of the child, it should be made clear that the abrogation is complete and entire, so that anyone who may hereafter claim for support of the child will be left to establish such rights by a civil action.

Reversed with directions to enter judgment in harmony with the views herein expressed.

MITCHELL, C. J., HOLCOMB, FULLERTON, and BEALS, JJ., concur.