[No. 26281. *En Banc.* March 10, 1937.]

*In the Matter of the Application of* FRANK F. DAY *for a Writ of Habeas Corpus.*

THE STATE OF WASHINGTON, *on the Relation of Frank F. Day, Plaintiff,* v. WILLIAM G. LONG, *Judge of the Superior Court for King County, Respondent.*[1]

[1]Reported in 65 P. (2d) 1049.

*Meier & Meagher,* for appellant.

*Ballinger, Clark, Mathewson & Force,* for respondent.

BEALS, J.—Frank F. Day and Marjorie Whitelaw intermarried in the city of Seattle, June 24, 1919. Three children were born to them: Nancy, born July 14, 1923; Virginia, December 6, 1926; and Joseph Daniel, April 8, 1928. Thereafter, Mrs. Day brought suit in the superior court for King county, asking for a divorce and the custody of her children, and in due time an interlocutory order was entered granting Mrs. Day a divorce, together with the custody and control of the children, subject to Mr. Day's right to visit them at certain times. Mrs. Day was awarded alimony in the sum of one hundred fifty dollars a month. Final

decree of divorce was entered October 2, 1929, the decree in all things confirming the interlocutory order.

May 21, 1931, on Mr. Day's application, an order was entered reducing the monthly alimony to seventy-five dollars, the payments to remain at that amount for six months, after which they should increase to one hundred dollars a month. The order contained a finding to the effect that Mr. Day's failure to pay alimony which had become due prior to the date of the order had been caused by lack of funds on his part, and that Mr. Day was not in contempt of court. The order further found that Mr. Day and his then wife, Vale N. Day, were fit and proper persons to have the care and custody of Mr. Day's children, although Mrs. Marjorie Day's custody of the children was not disturbed.

During the spring of 1936, Mrs. Marjorie Day became very ill, and by reason of her illness and her consequent inability to care for her children, she entrusted Nancy to Mr. and Mrs. C. B. Dodge, Virginia to Mr. and Mrs. M. W. McInnis, and Joseph Daniel to Mr. and Mrs. H. W. McCurdy. It appears beyond question that all of these people are of the highest character, and that they were at all times capable of furnishing to the children proper and affectionate care, together with all necessary support, education and maintenance.

Mrs. Day died April 9, 1936, and upon learning of her death, Frank F. Day, who had for some time resided in California with his third wife, the present Mrs. Day, went to Seattle, proposing to take his children back with him to California. Mr. and Mrs. McInnis refused to surrender custody of Virginia, and filed in the juvenile department of the superior court for King county a petition praying that the court inquire into the condition of Virginia and enter such an

order as should seem proper. Mr. Day thereupon sued out a writ of *habeas corpus,* which required Mr. and Mrs. McInnis to produce Virginia before the judge presiding over the juvenile court. Later during the course of the hearing, the chief probation officer of King county, under direction of the court, filed a petition stating that Nancy Day and Joseph Daniel Day were dependent children, and presented to the court the matter of their care and custody for consideration together with the matter of Virginia's custody.

The court consolidated all phases of the matter for hearing, and after taking considerable evidence, made findings of fact and conclusions of law, followed by a decree adjudging that Frank F. Day:

" . . . is not a fit and proper person to be awarded the care, custody and control of any of said children, and he is hereby deprived permanently of the care, custody and control of said children and each of them;"

that the three children were dependent and wards of the court; that Virginia should remain with Mr. and Mrs. McInnis, Nancy with Mr. and Mrs. Dodge, and Joseph Daniel with Mr. and Mrs. McCurdy, "each under the jurisdiction and control of this court."

Mr. Day's application for a writ of *habeas corpus* was denied and the proceeding dismissed. From this decree, Mr. Day appealed to this court, also filing here an application for a writ of certiorari, he being of the opinion that, under the opinion in the case of *State ex rel. Gray v. Webster,* 122 Wash. 526, 211 Pac. 274, an order of the juvenile court is not reviewable by appeal. Mr. Day's application for a writ of certiorari was regularly heard, and continued, to be considered with the appeal. (In so far as the decree dismissed Mr. Day's application for a writ of *habeas corpus,* it is, of course, subject to review by appeal.) The decree is

now before us for review, both upon the certiorari and the appeal.

Appellant assigns error upon the finding that he is not a fit and proper person to have the care, custody and control of his children; upon the finding that the children were dependent; upon that portion of the decree which purports to deprive him permanently of the custody of his children, makes them wards of the court, and decrees that the children remain under the jurisdiction of the court until further order. Appellant also complains of the decree in so far as it denied his application for a writ of *habeas corpus* and taxes costs against him in that proceeding.

The file in the action for divorce brought by Marjorie Day is in evidence. The findings in that case recite that both parties to the action appeared both in person and by counsel, and that witnesses were called by both plaintiff and defendant. The court found that the plaintiff, Marjorie Day,

" . . . has always been since her marriage a true, dutiful and loving wife and has fully discharged all the duties imposed upon her by the marital relationship."

Concerning Mr. Day's conduct, the court made the following finding:

"That defendant has been guilty of cruel treatment of plaintiff in that, among other things, he has repeatedly informed plaintiff that he has lost all love and affection for her; that he loves another woman; that he desires to be free from his marital obligations and has urged plaintiff to obtain a divorce from defendant and upon plaintiff's refusal to commence an action for divorce, the defendant, on August 21, 1928, when the youngest child was less than twenty weeks old, instituted an action for divorce from plaintiff in the superior court of the State of Washington for Skagit county, being cause No. 12860 on the records and files of said court and entitled 'Frank F. Day,

plaintiff, v. Marjorie Whitelaw Day, defendant;' that in said cause the defendant maliciously and falsely and knowing said charges to be untrue charged plaintiff with finding fault with defendant, with telling defendant he was no good and with informing him defendant could not make a living, could not run or operate anything and was just worthless, and with refusing to live with defendant; that in said cause defendant further maliciously and falsely and knowing said charges to be untrue, charged plaintiff with refusing to speak to defendant when defendant would go home, calling defendant a crook, a dirty dog, a worthless fellow and with saying that defendant was financially no good and with asking defendant to take his clothes from the home of plaintiff and with asking him to surrender the keys to his home so that he could not enter when he would go home to see the children; with refusing to speak to defendant and charging that when plaintiff did speak to defendant she growled and scowled and charging plaintiff with maintaining toward defendant a manner and demeanor such that it was not possible for the defendant to go to see his own children without being insulted and humiliated; that defendant further in said cause maliciously and falsely and knowing said charges to be untrue, charged plaintiff with extravagance, and further maliciously and falsely charged that the eldest daughter of plaintiff and defendant had passed beyond the control of plaintiff and that the plaintiff could not make said daughter mind her; that after a trial of said cause on the merits the court found said charges, and each and all of them, to be false and untrue and made and entered findings of fact and conclusions of law accordingly and an order dismissing said cause on December 10, 1928.

''That the defendant has for several years last past studiously and consistently neglected plaintiff and his said children in that, among other things, he neglected plaintiff during her various confinements and during several severe illnesses which plaintiff has undergone; that upon plaintiff's refusal to comply with defendant's request to obtain a divorce, defendant deliberately entered upon a course of conduct intended by

him to break down plaintiff's resistance to defendant's wishes and weaken and destroy the physical and mental health of plaintiff and as a result thereof plaintiff came to the verge of a nervous collapse which she was able to avoid only by proper medical care and kind and considerate treatment on the part of relatives and friends; that cause No. 12860 hereinabove referred to was tried on October 23, 1928, and that, at the conclusion of the said trial, this plaintiff was exhausted by the severe strain which she had undergone on account of the events leading up to the trial and by the trial itself and acting under the advice of her physician and others she shortly thereafter departed from the city of Seattle on a visit to relatives in Kansas City, Mo., in an attempt to regain her health; that before her departure from the city of Seattle she made a complete, ample and sufficient provision for the care of her said three children; that she employed a maid and in addition thereto a competent nurse and left the maid and the nurse in the home of plaintiff at No. 1516 7th Avenue West, in the city of Seattle, in direct charge of said children; occupying said residence also were two brothers of plaintiff, who several years ago at defendant's request took up their residence with plaintiff and defendant and have since remained in plaintiff's home; that as soon as the defendant learned of plaintiff's absence from the city of Seattle, the defendant came to plaintiff's home at No. 1516-7th Avenue West, in the city of Seattle, and without plaintiff's knowledge or consent removed the three children therefrom and removed therefrom all the household furniture, fixtures and effects of plaintiff and defendant in said residence and then, with the sole idea of harassing, annoying and disturbing this plaintiff beyond all endurance, telegraphed to plaintiff at Kansas City that he had taken the children and removed them to a cottage prepared for them at Montborne; that plaintiff immediately protested said action and demanded the return of said children together with said property and effects so removed by defendant and defendant refused to return said children or any of them and refused to return said property and

effects, or any of them until compelled to do so by order of this court in this cause."

By the decree, the custody of the children was awarded to plaintiff. The decree, however, also provided

" . . . that the defendant shall have the right to visit said children at plaintiff's home until the further order of the court herein but shall not have the right to remove said children, or any of them, therefrom, and provided, further, that during the months of June, July or August of each year, the defendant is given the right to take the eldest child, Nancy Day, from the home of plaintiff for a visit to defendant for one period of not more than two weeks at such time as may be agreed on by the parties hereto, and in case the parties cannot agree in regard thereto the court on application of either party will hear and determine the matter."

The substance of the interlocutory order and of the final decree is stated above.

During the month of February, 1931, appellant, who had meanwhile intermarried with one Vale N. Day, applied for a modification of the divorce decree, pursuant to which application the amount of the alimony was reduced, as above set forth. Early in the year 1932, appellant, in the Republic of Mexico, procured a divorce from Vale N. Day, and at about the same time, she, in the superior court of the state of Washington, also procured a decree of divorce. In March, 1932, Mr. Day left the state of Washington, and in the course of the same year married his present wife, who is, by a prior marriage, the mother of twin daughters thirteen years of age. One of these daughters has been living with appellant and his wife, it appearing that the other has been adopted by a relative living in the east. Since March, 1932, appellant has not seen any of his children, and apparently has made

no attempt to visit them nor has he manifested the slightest interest in their welfare. He testified that he wrote them a few letters several years ago, but paid no further attention to them. He is an entire stranger to his children, and has treated them with utter neglect.

Although for several years prior to the hearing appellant earned at least three thousand dollars per year, he paid nothing to Marjorie Day to assist her in caring for his children, but owed under the decree of the superior court a sum amounting to almost seven thousand dollars.

The evidence shows that appellant, with his wife and her child, occupy a small apartment consisting of a living room, kitchen and bath, the living room being used as sleeping quarters by all three persons. Interrogated as to what he intended to do if granted the custody of his three children, appellant stated that he had "arranged for a two-room apartment that will be sufficient." He stated that two of his children would sleep in the additional room; that he, his wife and her daughter would continue to occupy the other room; and that one of his children would be put upstairs with his wife's mother, who had "a one-room apartment similar to ours in the same apartment building." The present Mrs. Day did not appear before the court, and concerning both her and her mother, with whom one of the children was to live, the court was entirely without information.

Appellant testified that, although he was possessed of eight hundred dollars in cash, he had contributed nothing to the support of his children. Concerning his neglect to provide for these children, appellant testified:

"Q. You know, do you not, that during the last four years prior to her death, Marjorie Day, their mother,

was working to support the children, and was having difficulty doing so? A. I assumed she was not making enough to support them. Q. How did you think they were being supported during that time? A. I assumed that they were being assisted by relatives. Q. Why didn't you support them during that time since you left the state of Washington in March, 1932? A. I didn't send any money for their support because I got my neck bowed.''

Evidently, the mother of these children consecrated her life to their welfare with unselfish devotion, continuing to work while suffering from a mortal disease, while appellant, after having been guilty of gross misconduct toward his first wife, was callously neglectful of his children and indicated not the slightest interest in their welfare.

The three families who assumed the burden of caring for the children, and with whom they are now living, were all close personal friends of Mrs. Day, and concerning these families appellant's counsel stated:

''We stipulate that the people with whom these children live are excellent people, and we do not question their qualification to care for the children.''

█ Rem. Rev. Stat., § 1987-1 [P. C. § 593], a portion of the ''juvenile court law,'' defines ''dependent children.'' The section contains eighteen subdivisions, of which the following should be considered in connection with the questions here presented. These subdivisions define a dependent child as one

''(5) Who has no parent or guardian; or who has no parent or guardian willing to exercise, or capable of exercising proper parental control; or

''(6) Who is destitute; or

''(7) Whose home by reason of neglect, cruelty or depravity of its parents or either of them, or on the part of its guardian, or on the part of the person in

whose custody or care it may be, or for any other reason, is an unfit place for such child; or . . .

"(13) Whose father, mother, guardian or custodian is an habitual drunkard; or do not properly provide for such child, and it appears that such child is destitute of a suitable home or of adequate means of obtaining an honest living, or who is in danger of being brought up to lead an idle, dissolute or immoral life; or where such child is without proper means of support; or . . .

"(16) Who from any cause is in danger of growing up to lead an idle, dissolute or immoral life; . . ."

Rem. Rev. Stat., § 6907 [P. C. § 1423], which was enacted long prior to the dependent child statute above referred to, reads as follows:

"Henceforth the rights and responsibilities of the parents, in the absence of misconduct, shall be equal, and the mother shall be as fully entitled to the custody, control, and earnings of the children as the father; and in case of the father's death, the mother shall come into as full and complete control of the children and their estate as the father does in case of the mother's death."

Rem. Rev. Stat., § 6908 [P. C. § 8828], reads in part as follows:

"Every person who, 1st: Having any child under the age of sixteen years dependent upon him or her for care, education or support, deserts such child in any manner whatever, with intent to abandon it;

"2d: Willfully omits, without lawful excuse, to furnish necessary food, clothing, shelter, or medical attendance for his or her child or children or ward or wards; . . . shall be guilty of a gross misdemeanor."

A difficult question is presented by appellant's contention that the juvenile court law is not applicable to the situation here presented, and that it cannot be held that the children were "dependent," within the

purview of that statute. Section 1987-14 [P. C. § 606] of the act reads in part as follows:

"This act shall be liberally construed to the end that its purpose may be carried out, to-wit: that the care, custody and discipline of a dependent or delinquent child as defined in this act shall approximate as nearly as may be that which should be given by its parents . . . No dependent or delinquent child as defined in this act shall be taken from the custody of its parent, parents or legal guardian, without the consent of such parent, parents or guardian, unless the court shall find such parent, parents or guardian is incapable or has failed or neglected to provide proper maintenance, training and education for said child; . . ."

It is not contended that the children own any property of any sort or description. On the death of their mother, the children were being cared for by friends, who at the mother's request had taken charge of them during Mrs. Day's illness. Until the appearance of the father upon the scene, the children, while not destitute in the sense that they were in want of the necessities of life, were proper subjects for the care of the court, if the court should, upon being advised of the facts, deem an investigation advisable. Appellant had, beyond question, for years failed to properly provide for his children, and during the mother's sickness they were unquestionably "destitute of a suitable home," and were for this reason cared for by friends (subd. 13 of the act, *supra*). They had no suitable *family* home, due to appellant's neglect. If appellant had not demanded possession of his children, they would clearly have come within subd. 5 of the act, *supra*. This being true, we are of the opinion that when appellant, under the circumstances disclosed by the record in this case, expresses his willingness to exercise control (which means more than mere discipline) of

his children, the court has jurisdiction under subd. 5 of the act to hear and determine the question of whether or not the parent is "willing to exercise, or capable of exercising, proper parental control." If it be determined that, under the circumstances of the case, the juvenile court has jurisdiction to hear such a question, it may determine the same in accord with established rules of law.

We conclude that, under the facts of this case, the court was warranted in holding that the children were dependent, within the scope of the statute. Such a law must be construed liberally in aid of its manifest purpose to help children who need the court's protection. Even in criminal prosecutions, this court has held that the statute should be so construed as to consider "the broad underlying policy and the dominant purpose of the whole law of which the section under consideration is a part." *State v. Adams,* 95 Wash. 189, 163 Pac. 403. The case cited was followed in the case of *State v. Clevenger,* 161 Wash. 306, 296 Pac. 1054.

This is not a case in which children are taken away from a parent who has been living with them, or of interference by the court in an established home. It is simply a question of whether or not children abandoned by their father must be restored to him as pure matter of legal right on his part to demand their custody, regardless both of past history and the present situation, and in spite of the fact that he will take them beyond the jurisdiction of the courts of this state.

In his brief, appellant states that no return to the writ of *habeas corpus* was made by Mr. and Mrs. McInnis, and he therefore, while admitting that he was not deprived of any substantial right by the failure to file any answer or return, contends that the writ of

*habeas corpus* should have been granted upon the un-
controverted allegations contained in the petition for
the writ. Appellant states that this contention was
submitted to the trial court, who stated that the pro-
ceedings were informal, and that, as the application
for the writ of *habeas corpus* and the hearing as to
whether or not the children were dependent had been
consolidated, no formal answer to the writ was neces-
sary. Appellant does not call our attention to any
portion of the statement of facts in which it is shown
that this matter was ever mentioned to the trial court,
and we find no reference thereto. The record being
silent as to this matter, the error, if error there was,
is not available to appellant.

Appellant contends that the record in the di-
vorce case between Marjorie Day and himself was
competent only to show that the parties had been
divorced and the custody of the children awarded to
the wife. Assuming that, as to the facts found, the
record is not conclusive, the findings, having been
made in a contested case, in which both parties ap-
peared and introduced evidence, should be considered
by the court in determining such questions as were pre-
sented here. Marjorie Day was dead; she could not
speak for herself or for her children, and the solemn
record made in the divorce case was entitled to be
introduced in evidence and considered. Appellant is
correct in arguing that any portion of this record
favorable to him should also be noted, and the por-
tion of the decree permitting him to visit his children
is hereinabove quoted.

As has been repeatedly stated, in cases where
the superior court has jurisdiction to determine the
custody of a child, the welfare of the child is the para-
mount consideration. It is also true that the right
of a parent is always given great weight, and that, as

was said by Judge Dunbar, speaking for the court in the case of *State v. Rasch,* 24 Wash. 332, 64 Pac. 531,

"It is no slight thing to deprive a parent of the care, custody, and society of a child, or a child of the protection, guidance, and affection of the parent."

Mere temporal or social advantages weigh little as against the right of a parent, and the ties of blood should not be interfered with or the right of the parent abridged, save for the most powerful reasons. *In re Mead,* 113 Wash. 504, 194 Pac. 807; *In re Smith,* 118 Wash. 1, 202 Pac. 243; *Penney v. Penney,* 151 Wash. 328, 275 Pac. 710; *In re Brenner,* 154 Wash. 400, 282 Pac. 486; *In re Kneeland,* 160 Wash. 64, 294 Pac. 562.

The principle that the welfare of the child is the paramount consideration has been recognized and followed by this court in many cases. *Clark v. Clark,* 92 Wash. 450, 159 Pac. 702; *McClain v. McClain,* 115 Wash. 237, 197 Pac. 5, 202 Pac. 173; *Loomis v. Loomis,* 144 Wash. 116, 256 Pac. 1032; *Bigelow v. Bigelow,* 148 Wash. 138, 268 Pac. 597; *Broesch v. Broesch,* 159 Wash. 409, 293 Pac. 464; *In re Penner,* 161 Wash. 479, 297 Pac. 757; *Ostrander v. Ostrander,* 176 Wash. 669, 30 P. (2d) 658. The two principles, then, the welfare of the child and the right of the parent, must be considered together, the former being the more weighty.

Appellant vigorously contends that the writ of *habeas corpus* for which he applied should have been granted, and his daughter Virginia delivered to him pursuant thereto. *In re Allen,* 139 Wash. 130, 245 Pac. 919, was an appeal from findings in favor of the defendant in a *habeas corpus* proceeding. It appeared that J. V. Allen, the father of a minor daughter whose mother was dead, had turned the child over to Mr. and Mrs. Lathrum. The father, having later remarried,

wanted his child, and applied for a writ of *habeas corpus* requiring the Lathrums to turn her over to him. The trial court denied the writ, and entered judgment refusing to change the care, custody and control of the child until further order of the court. From this order, the father appealed. In affirming the judgment, this court said:

"This is a typical case wherein, notwithstanding the original and primary right of a parent, the great and leading object to be obtained is the welfare of the child. With this rule in mind, the case must be resolved upon the facts peculiar to it. A fair view of the facts could not be presented without largely detailing the testimony of a great number of witnesses, which in our opinion would serve no useful purpose. Suffice it to say that, upon consideration of the oral arguments of respective counsel, their elaborate briefs and an examination of the evidence, we are satisfied that the judgment of the trial court was correct."

In the case cited, an exactly similar question was determined against the contention of the father. The welfare of the child was deemed the paramount consideration, and it was held that the natural right of the parent must yield when in conflict with the child's best interests.

In the case at bar, the facts present a question difficult of solution. Objections can readily be noted to any decree which the lower court might have entered. Appellant for years neglected his children, knowing that his wife without aid from him was unable to support them, and being perfectly willing, as he himself testified, to assume that other persons would contribute to their support.

As to the situation in connection with appellant's home in California, we know nothing save from his own testimony. His present wife has with her a young child of her own. Appellant testified that his wife is

"fond of children," but he nowhere even intimated that she is anxious, or even willing, to take her husband's three young children into her home, and give them the care and affection which they should have. Appellant testified that one of his children would occupy a small apartment with Mrs. Day's mother, but whether or not such an arrangement is satisfactory to this lady, we do not know. Certainly, the living quarters which appellant proposed to provide for his united family seem so inadequate as to necessarily result in considerable discomfort to all concerned. Mere discomfort, in so far as the children themselves are concerned, may be unimportant, but the matter has some bearing as concerning the attitude of Mrs. Day and her mother, concerning which we know nothing.

The question here is not the degree of comfort or luxury which may surround the children, but where they will receive the greater degree of affectionate and discriminating care which will better tend to fit them to take their places in the active affairs of life. The record is silent as to the financial status of the three families with whom the children are now living. We know only, as stipulated by the parties, that the families are worthy, and that the children are being well cared for. Appellant's means are adequate to properly support the children. The questions at issue must be determined upon matters entirely disconnected with the financial resources of any of the parties concerned.

Appellant seems to take the position that his children are being taken from him and given to strangers. This is not the case. The children are not given to anyone; they are made wards of the court. Any matter concerning the permanent custody of the children, or any of them, must be determined when presented. No such matter inheres in this proceeding.

The trial court had the great advantage of seeing and hearing the witnesses, and of propounding questions to them and studying their demeanor on the stand, their candor and their disposition as manifested in the course of the trial. Under these circumstances, great weight should be given to the conclusion reached by the trial court. Complete findings of fact were entered, including a direct finding that appellant "is not a fit and proper person to have the care, custody and control of any of said children." The record clearly indicates that appellant, during the life of the children's mother, allowed his ill feelings toward her to completely crowd out of his mind and heart any affection which he may have had for his children and all interest in their welfare. Any paternal feelings which he may have had were completely subordinated to his spite against his former wife. In our opinion, the evidence clearly preponderates in favor of the decision of the trial court.

In reaching this conclusion, we have not overlooked the fact that the children's uncle, a brother of their deceased mother, testifying voluntarily as a witness, stated that he had known appellant for many years; that he had extended financial assistance to his sister to the extent of about $1,800 a year, or a total of over $9,000 during the period that appellant had failed to support his children; finally concluding, however, that, after talking with Mr. Day during the course of the hearing, he had come to the conclusion that the children should be kept together, and that the responsibility was the father's. The opinion of this witness is entitled to careful consideration, but is not controlling. Of course, the responsibility should be borne by appellant, but, at least up to this time, he has shown himself unworthy of the privilege of assuming it.

In one particular, the decree appealed from must be modified. By its terms, appellant was deprived permanently of the care, custody and control of his children. No such provision should have been included in the decree. What the future holds, no one can tell. It may be that, at some future time, appellant's children, or one or two of them, should go to him. The court properly made the children wards of the court. For the present, at least, they should remain such wards. The decree appealed from will be modified by eliminating therefrom that portion purporting to permanently deprive appellant of the custody of his children.

As modified, the decree will stand affirmed. No party will recover costs in this court.

STEINERT, C. J., MAIN, HOLCOMB, BLAKE, and ROBINSON, JJ., concur.

TOLMAN, J. (dissenting)—In my judgment, the majority has grievously erred in its construction of the "juvenile court law" (Rem. Rev. Stat., § 1987-1 [P. C. § 593]), which defines what the legislature meant by the use of the term "dependent children."

There is, of course, no contention that the children here involved were delinquent children under that statute. But, at most, they were dependent children only. We have, therefore, only to read the act and from its contents learn what was the legislative intent. It is unnecessary to set forth the eighteen subdivisions containing the legislative definitions, because, whether they be read casually or with extreme care, the result is exactly the same; and that result is that, by the plainest terms, not subject to judicial construction, the legislature defined a dependent child to be one in want: In want of parental care and control; in want of proper home surroundings; in want of sustenance,

or one who, for want of proper care, is subjected to conditions naturally leading to idle, dissolute and immoral courses. No stretch of the imagination would permit one to say that the children here involved were subjected to anything of the several kinds mentioned in the statute.

It is true that those who had the custody and control of these children were not their natural parents or their legal guardians, but there is nothing in that which exposed the children to any of the evils enumerated in the statute. Many a foster parent has properly performed the duties of a natural parent, and a foster parent, whose rights are not challenged by one having a better legal right, will be accorded the rights and held to the duties of a natural parent by the law. In the case cited by the majority, *In re Allen*, 139 Wash. 130, 245 Pac. 919, the natural father, having voluntarily turned the child over to another who was without legal right, was held estopped from reclaiming his own child.

But, in any event, the natural father was in existence and was asserting his rights at and before the filing of the petitions under the juvenile court law and at all times since. Hence, it cannot be successfully contended that these children had no parent or guardian capable of and willing to exercise parental control.

So, here, there was absolutely no basis for invoking the juvenile court law. To hold otherwise is to destroy the legislative definition of what is a dependent child, and to leave in existence no standard whatever for a judicial determination of dependency. While juvenile judges will, no doubt, act fairly and humanly, as they see the facts, yet, without a statutory standard, they can act only on their own idea of what is right, so that families may be broken up or destroyed at the whim or will of the judge presiding.

The decree of divorce referred to by the majority, which awarded the custody of the children to the mother, was an adjudication between the father and the mother only, and by it the father's rights were not destroyed, but were subordinated to the rights of the mother. Upon the mother's death, her rights ended and the father's rights alone remained, no longer subordinate to anything.

While his past conduct is not to be commended, yet we do find the father here seeking the custody of his children immediately after the death of the mother and the termination of her rights. He is the natural and the legal father, and his rights as such have been in no way impaired by anything which has heretofore occurred. He is entitled to the custody of his children, both under the laws of nature and the laws of this state. If, having the children in his custody, he fails in his duty to them, quite another question will be presented.

In my opinion, the judgment should be reversed, the juvenile proceedings should be dismissed, and appellant's rights should be adjudicated in the *habeas corpus* proceeding, as herein indicated.

For these reasons, I dissent.

MILLARD and GERAGHTY, JJ., concur with TOLMAN, J.