[No. 32883. Department Two. June 24, 1954.]

*In the Matter of the Welfare of* RENEE PAMELA CROZIER, *a Minor.*[1]

*Hall, Cole & Lawrence* and *Stanley F. Atwood,* for relators.

*Haugan & Shellan,* for respondents.

SCHWELLENBACH, J.—Renee Pamela Crozier was born in Modesto, California, August 11, 1949, as the lawful issue of William "Bud" Crozier and Ruth Crozier, his wife. They have two other children, who are older than Renee. Shortly after Renee's birth, the family moved to Seattle, where they resided with Mrs. Edith Kogenhop, the husband's sister. Wallace T. and Alice Gibson resided next door, and the back yards are enclosed in one fence. (At the time of the

[1] Reported in 272 P. (2d) 136.

hearing, Mr. Crozier was thirty-seven years of age, and his wife was thirty-two years; Mr. Gibson was fifty-four years of age, and his wife was forty-nine years.) Mr. Crozier worked as a cab driver. He did not earn very much money, and in October of 1950, Mrs. Crozier started to work at the Boeing plant. She hired Mrs. Gibson as a "baby sitter" for the three children for five dollars per day. In a short time, Mrs. Gibson found it more convenient to keep the children in her own home and took them there.

In June of 1951, while working at Boeings, Mrs. Crozier fell and hurt her back, with the result that she was compelled to give up work. The Croziers took back the two older children, but it was agreed that Renee would remain with Mrs. Gibson without charge. Mrs. Crozier explained at the hearing that Renee was just at the lifting stage and that she could not lift the child because of her back injury.

In November of 1951, Mr. Crozier obtained employment from Sears Roebuck and Company in Aberdeen, and moved to that city with his wife and two older children. Renee was left with the Gibsons. The Croziers explained that the housing at Aberdeen was such that they felt they should not take Renee along. (In the meantime, Mrs. Gibson had grown very fond of Renee. She had taken a child to keep once before and had grown very fond of her, and later the child's parents had taken her away.) The Croziers came back to visit Mr. Crozier's sister at Christmas time and had Renee with them about four or five hours. When they were ready to leave, they took her back to the Gibsons, and Mrs. Crozier said, "You will hear from me." The following February, Mr. Crozier came up to have his sister help him with his income tax, and he visited with Renee for a couple of hours. About six months after moving to Aberdeen, Mr. Crozier was transferred by the Sears company to Modesto, California, where they now reside. They are buying a three-bedroom home in the residential section of town. It has large bedrooms, a large living room, and a large kitchen. A photograph of the two older children, which was introduced in evidence, shows them to be healthy and happy.

Apparently no financial arrangements were made with the Gibsons when Renee was left. Mrs. Kogenhop testified that she had arranged with her brother that she would provide the child with clothing and pay doctor bills, for which he would reimburse her; that she made these offers to Mrs. Gibson, who refused to take any money and refused to let her pay any bills. She had Renee over to her house from time to time and took her away on a vacation a couple of times. She always kept her brother advised concerning Renee.

Sometime in late 1952, Mrs. Gibson wrote to Mrs. Crozier, requesting permission to adopt Renee. Mrs. Crozier replied that she would never consent to the child's adoption. In 1953, Mrs. Kogenhop planned to spend her Thanksgiving vacation in Modesto, and Mrs. Crozier wrote to Mrs. Gibson (sending a copy of the letter to Mrs. Kogenhop) asking her to send Renee along. Upon receipt of the letter, Mrs. Gibson went over to see Mrs. Kogenhop and said:

"Well, you know I would not allow you to take her. . . . The arrangements were with Ruth and Bud. They left her with me, so I will not let you take her. If they want her, they must come and get her."

November 21, 1953, not more than nine days after receiving the letter from Mrs. Crozier requesting that Renee be sent down for a visit, the Gibsons commenced this action. The petition alleged that "the child was openly and publicly subjective to extremely abusive treatment and conduct, suffering repeated beatings and other cruel conduct and punishment;" that the natural parents declared that they did not wish to keep the child and had no further use for her; that the parents made no effort to pay for her support, "but in fact completely abandoned and deserted said child." They prayed that Renee be declared to be a dependent child.

At the hearing, it developed that the "extremely abusive treatment" consisted of a couple of spankings administered to that portion of the child's anatomy where spankings are usually administered. There is no question but that the Gibsons have given Renee exceptionally good care.

The trial court found that the child was completely left and abandoned to the Gibsons; and that the parents were not suitable or proper persons to have the care, custody and control of Renee; that they were irresponsible and unbalanced and should be deprived of all parental rights, benefits, and privileges to the children. The court made an order declaring Renee to be a dependent child and a ward of the court, and placed her in the custody of the Gibsons. It was further ordered, adjudged and decreed

". . . that the natural parents of said child, RENEE PAMELA CROZIER, to-wit, WILLIAM "BUD" CROZIER and RUTH CROZIER, are hereby deprived and cut off completely of all parental rights, benefits and enjoyments, including the care, custody, control and visitation of said minor child, and in all other respects."

Upon application, a writ of certiorari was issued out of this court requiring the Honorable William G. Long, Judge of the superior court for King county, to certify and send up a full and complete statement of facts and transcript of all proceedings, in order that the matter might be reviewed by this court.

In order to constitute abandonment of a child by its parent or parents, there must be an intention to abandon in the sense of relinquishing all claims that the parent or parents had upon it. *In re Ward,* 39 Wn. (2d) 894, 239 P. (2d) 560; *In re Warren,* 40 Wn. (2d) 342, 243 P. (2d) 632. There was no abandonment here.

The allegations of the petition were sufficient to give the juvenile court the right to hear and determine whether or not Renee was a dependent child. The question is whether or not such allegations were proved.

"The juvenile court has no jurisdiction over a minor unless it is proved that the minor is either (a) a delinquent, or (b) a dependent child. *In re Miller, ante* p. 319, 242 P. (2d) 1016. The concept that all children are wards of the state, and that the state and its agencies have an *unhampered* right to determine 'what is best for the child,' is not a recent or an advanced idea. It belongs to a repudiated political and moral philosophy foreign and repugnant to American institutions. Stated more specifically, the mere

fact that certain individuals invoke the aid of our courts to litigate the question of who shall have the custody and control of a minor, does not, *ipso facto*, vest our courts with jurisdiction to decide the issues thus presented. The court must first find the child either delinquent or dependent." *In re Warren*, 40 Wn. (2d) 342, 243 P. (2d) 632.

RCW 13.04.010 contains twenty sections defining "dependent children." Of these, only the following can possibly apply:

"(6) Who has no parent or guardian willing to exercise, or capable of exercising, proper parental control; or . . .

"(8) Whose home by reason of neglect, cruelty or the depravity of its parents or either of them, or on the part of its guardian, or on the part of the person in whose custody or care it may be, or for any other reason, is an unfit place for such child; or . . .

"(15) Whose father, mother, guardian, or custodian is an habitual drunkard, or does not provide properly for the child, and it appears that such child is destitute of a suitable home or of adequate means of obtaining an honest living, or who is in danger of being brought up to lead an idle, dissolute or immoral life; or where such child is without proper means of support; or . . ."

Sections (8) and (15) do not apply because the child is now and has been in the home of the Gibsons, where she is receiving exceptionally good care. See *In re Frank*, 41 Wn. (2d) 294, 248 P. (2d) 553.

While Mrs. Crozier was being examined by the court, she testified:

"Q. When you left here, or before that time, did you ever tell the Gibsons anything as to how long you expected to leave the child with them? A. No, I never told them definitely. Q. Did you have any intentions at that time, at the time you left, as to how long the child would remain? A. I had intentions of getting her from time to time, but each time it was—like when we moved to Aberdeen. She knew we were moving because we had taken a trip prior and when we came back we told her we were moving. So we went to Aberdeen, and things just didn't look very good. So the child continued to stay there.

"So then when we went to California we left the child with the thought that we would get her when we got settled.

And it just went on and on. And this year he would get a vacation and we would be able to pick her up. Last year we couldn't afford to come up in June. That is when his vacation was. . . .

"Q. (by the Court) What was your idea by requesting in this letter of November 11 that the child be brought down by your sister? What was the idea of that? What did you have in mind? A. I had in mind seeing the child and seeing how the child would react to the change. I wanted to see her. I wanted to see how she would react to the rest of us. Q. Did you intend to take her back into your family? A. Yes. Q. Definitely? A. Yes. Q. Permanently? A. Yes. But I wanted to apply her to it first. I didn't want to break Alice's heart, and I didn't want to break the child's heart. I had no intention of ever hurting Alice at any time. . . .

"Q. As I get it from your letter of November 11, before you made any decision as to taking this child permanently back into your family you wanted to see her for a while and see how she would adjust to your family? A. Yes. Q. You thought that that was the logical procedure to follow? A. Well, I felt it was the best procedure to follow under the circumstances because she had been with the Gibsons for some time and I didn't know what she had been taught. I didn't know what had been put into her mind. I know that she called me Mamma and she called Mrs. Gibson Mama Alice; and that is the reason that I did not say anything about it, as long as it was Mama Alice. I wasn't against that. That was perfectly all right. But I wanted to see the child and know just what her reactions would be. You can understand that I meant well. Q. Well, I wish you would just answer the questions. A. I'm sorry. Q. What state of affairs would have moved you to keep the child permanently? In other words, I am a little uncertain as to what you had in mind, and I would like to have you tell me. You said you would try her out a while. What did you consider as the important facts which would induce you either to keep the child or return her to the Gibsons? A. I will try to explain to the best of my ability. I felt that maybe if I had the child for a little while and she didn't adjust, then I would try to have her visit me at intervals and at such time she would get acquainted with me again, instead of shocking her all at once. You know a child—I have two others—Q. I'm not interested in your philosophizing and telling me what I know. I am just asking you to tell me what you considered the factors that would have determined you to decide to keep her. A. I would have kept her. It is just that I felt maybe

she would have to come back at intervals, instead of staying all at once; that she would have to become acquainted all over."

Quite often, throughout the hearing, the trial judge evidenced an impatient and hostile attitude toward the Croziers and their counsel. We do not question his sincerity or his interest in the welfare of the child. However, we do feel that he permitted his emotions to influence his judgment sufficiently to run counter to prior decisions of this court concerning abandonment and dependency. Our examination of the entire record convinces us that Mrs. Crozier acted throughout as a loving mother. She wanted her child, but she wanted the shock to Renee of being uprooted from her present home made as easy as possible. In *Penney v. Penney,* 151 Wash. 328, 275 Pac. 710, we said:

"The child is entitled to know and enjoy the father's love and care, to be brought up under the circumstances and conditions to which she was born and to have the love and society of brother and sister. The fostering care of a stranger, no matter how wise and kind, cannot fill the place of these. There is every reason to believe, even though the child's attitude might be hostile at first, that, in a few months or a year or two at most, she will fit as naturally into her father's home as if she had known no other; and she will then have the home memories to carry through life and hand down to her children. In other words, she will be a Penney, as she was born, with the memories and traditions of a Penney, and not a Mohr, whose traditions may be wholly foreign to those of the Penney family."

The trial judge was concerned about the emotional trauma which would be caused to the child if she were uprooted from the Gibsons' home. The *Penney* case, which involved a thirteen-year-old girl who had, for ten years, been placed in the custody of strangers, answers this problem:

"Under these conditions, the love and affection which have grown up between the child and those in whose care she has been for ten years, is not a controlling factor. Nor is the fact, if such should be the fact, that the strangers to the blood might be able to give her more pleasant and luxurious surroundings, better educational facilities and like

advantages, a factor to be weighed against the father's rights, if he be a fit and proper person to have the custody of his own child."

Upon the record, Renee was not a dependent child. The trial court was in error in finding Renee to be a dependent child and that her parents were irresponsible and unbalanced and should be deprived of all parental rights. The court's order based upon such findings is reversed.

GRADY, C. J.; HAMLEY, and WEAVER, JJ., concur.

HILL, J., concurs in the result.